UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BRYAN T. HARRISON, | |
|         Petitioner, | Case No. 4:18-cv-00177-CWD |
| v. | **MEMORANDUM DECISION AND ORDER** |
| ANDREW SAUL,[1] Commissioner of Social Security Administration, | |
|         Respondent. | |

## INTRODUCTION

Currently pending before the Court is Bryan Harrison's Petition for Review of the

Respondent's denial of social security benefits, filed on April 20, 2018. (Dkt. 1.) The

Court has reviewed the Petition for Review and the Answer, the parties' memoranda, and

the administrative record (AR), and for the reasons that follow, will remand the decision

of the Commissioner.

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Acting Commissioner Nancy A. Berryhill as the Respondent in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## PROCEDURAL AND FACTUAL HISTORY

Petitioner filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, on May 8, 2014. This application was denied initially and on reconsideration, and a hearing was conducted on April 14, 2016, before Administrative Law Judge (ALJ) Michelle Kelley. After considering testimony from Petitioner and a vocational expert, ALJ Kelley issued a decision on November 23, 2016, finding Petitioner not disabled. Petitioner timely requested review by the Appeals Council, which denied his request for review on February 16, 2018.

Petitioner timely appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the alleged disability onset date of January 30, 2014, Petitioner was thirty-four years of age. Petitioner obtained an Associate's degree in behavioral and social science. Petitioner received a commercial helicopter pilot's certificate and flight instructor certificate, both of which are no longer valid. His past relevant work experience includes work as a customer service representative, technical support representative, certified flight instructor, relay operator, valet driver, and ticket broker.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantial gainful activity. The ALJ

found Petitioner had not engaged in substantial gainful activity since his alleged onset date of January 30, 2014. At step two, it must be determined whether the claimant suffers from a severe impairment. The ALJ found Petitioner's depressive disorder, anxiety disorder, somatoform disorder, and migraines severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found that Petitioner's mental impairments did not meet or equal the criteria for any listed impairment. The ALJ specifically considered whether the severity of Petitioner's mental impairments, considered singly and in combination, met or medically equaled the criteria of listings 12.04 (Affective Disorders), 12.06 (Anxiety Related Disorders), and 12.08 (Personality Disorders). (AR 21.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (effective August 12, 2015).[2] If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity (RFC) and then determine, at step four, whether the claimant has demonstrated an inability to perform past relevant work.

The ALJ determined Petitioner retained the RFC to perform a full range of work at all exertional levels, but had the following nonexertional limitations: he could understand, remember, and carry out unskilled tasks up to the specific vocational

---

[2] The agency revised the medical criteria for evaluating mental disorders effective January 17, 2017. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016). The rules in effect at the time of the ALJ's decision are cited above, and must be applied until the effective date of the final rules. *Id.*

preparation (SVP) of 2 and GED reasoning of 3; he should have no interaction with the public and only occasional interaction with supervisors and coworkers; he should be limited to occasional judgments and decisions for unskilled work and limited to occasional changes in a routine work setting; and he should not work at a fixed production rate, but he would be able to perform goal oriented work. (AR 22.) According to the vocational expert, an individual with the above RFC would be limited to unskilled work. (AR 63.)

In determining Petitioner's RFC, the ALJ found that Petitioner's impairments could reasonably be expected to cause the symptoms he alleged, but that his descriptions of the intensity, persistence, and limiting effects of his conditions were not entirely consistent with the medical evidence and his daily activities. (AR 24-25.) The ALJ analyzed the evidence in the record separately with regard to Petitioner's migraines and his mood disorders.

The ALJ cited three reasons based upon her review of the medical evidence of record to discredit Petitioner's testimony about the frequency and severity of his migraines. First, the ALJ noted Petitioner recorded the frequency of his migraines in a journal, but discredited the evidence because there were only two treatment notes documenting headaches, which occurred on July 23, 2014, and September 25, 2014. Second, the ALJ discredited Petitioner's account of his headache severity, because treatment records indicated Petitioner had not tolerated control-type medications, and he was instead using abortive therapy with Imitrex. The ALJ also cited Petitioner's failure to

follow through with a recommended neurology consult due to inability to afford treatment, and the lack of brain imaging, to discount Petitioner's assessment of his headaches' severity. (AR 24-25.) Based upon the above, the ALJ concluded that the treatment records are "generally consistent with the claimant's testimony that most days per month he is functional." (AR 25.)

Turning to Petitioner's mood disorders, the ALJ relied primarily upon clinical observations recorded in Petitioner's medical records to discount the alleged severity and frequency of Petitioner's depressive episodes. For instance, she discredited Petitioner's allegations that his depressive episodes were severe and frequent, because only two treatment records, dated May 15, 2014, and February 13, 2015, noted instances of worsening depression. Next, she cited observations about Petitioner's appearance recorded in the medical records, where he was described as in "no acute distress," and that he looked "well." She cited also one report from April 2016 which stated that Petitioner was "healthy appearing and in no acute distress…no appearance of depression." (AR 25.) In reliance upon these four medical records, the ALJ concluded "clinical observations do not wholly support the alleged severity of the claimant's depression." (AR 25.)

The ALJ also discounted Petitioner's symptom reports for three additional reasons. First, she noted one medical report indicated his psychological symptoms improved with treatment and medication. (AR 25.) Second, she cited Petitioner's failure to consistently follow recommended treatment, which occurred twice in 2014 and once in

2015, because he stopped taking his antidepressant medications without consulting his providers. (AR 25.) And last, she noted he used marijuana against medical advice. (AR 25.)

The ALJ examined also Petitioner's daily activities, which she found inconsistent with someone "alleging complete disability." (AR 24.) For instance, the ALJ noted Petitioner reported no problems with personal care, household chores, and meal preparation. (AR 24.) The ALJ remarked Petitioner could drive and shop in stores up to three times per month as well. (AR 24.)

Next, the ALJ considered the opinions of Petitioner's treating providers, Zachary Halversen, M.D.,[3] and Verna Roberts, Ph.D.; and consultative examiner Donald Whitley, Ph.D.[4] Both Dr. Halversen and Dr. Roberts were of the opinion Petitioner had marked limitations in several areas of social functioning, which would result in more than two absences each month and an inability to adhere to a forty hour per week schedule on a consistent basis. The ALJ gave the opinions of Dr. Halversen "minimal weight" because they were internally inconsistent; inconsistent with his treatment notes and objective findings; inconsistent with other objective findings; and inconsistent with Petitioner's activities of daily living. (AR 26.)

Similarly, the ALJ gave Dr. Roberts' opinions little weight based upon the limited treatment history; her note that Petitioner's test results revealed some exaggeration; lack

---

[3] The parties incorrectly refer to Dr. Halversen as "Dr. Halverson."
[4] The ALJ did not separately consider the treatment notes and opinion of Tyler Mayo, D.O.

of support in her treatment records; inconsistency among her opinions; and her failure to explain how she measured Petitioner's social functioning, concentration, persistence, pace, or episodes of decompensation. (AR 27.)

Dr. Whitley performed a consultative examination on September 25, 2014. (AR 26.) He presented his clinical observations in a narrative format, concluding Petitioner had good concentration; poor to fair short-term memory; and fair adaptability to different situations, among other conclusions. The ALJ determined "the vague statements within [Dr. Whitley's] opinion are generally consistent with the above residual functional capacity. Therefore, the undersigned affords only some significant weight to this opinion." (AR 26.)

The ALJ instead relied upon the opinions of the two state agency medical consultants and two state agency psychological consultants, who provided their opinions over the course of their records review during 2014. (AR 27.) The medical consultants, who neither examined nor treated Petitioner, determined Petitioner's migraines were "nonsevere," "intermittent," and "improved." (AR 27.) The ALJ gave these opinions "significant weight." (AR 27.) The non-examining psychological consultants similarly opined Petitioner's mood disorders resulted in, at most, mild difficulty in concentration, persistence or pace. (AR 27.) The ALJ gave the psychological opinions "some weight," finding them to be "well supported." (AR 27.)

Based upon her evaluation of the record as summarized above, the ALJ found Petitioner was not able to perform his past relevant work, but retained the RFC to

perform the requirements of representative occupations such as Office Helper, Checker I, and Laundry Folder. (AR 29-30.) Consequently, the ALJ determined Petitioner was not disabled.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a

preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

When reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

# DISCUSSION

Petitioner argues the ALJ erred at steps three and four of the sequential evaluation. He asserts the ALJ did not consider whether the combined effect of Petitioner's mood disorders and his migraines medically equaled a listing at step three. Pet. Brief at 12. Next, Petitioner maintains the ALJ improperly evaluated the opinions of his treating providers, Drs. Halversen, Mayo, and Roberts. Pet. Brief at 17. And last, he contends the ALJ erroneously assessed Petitioner's credibility. Pet. Brief at 20. Accordingly, Petitioner argues the ALJ's errors resulted in an inaccurate RFC that failed to account for all his medically determinable impairments and their effect as a whole on his capacity to perform work. Petitioner asks the Court to reverse the ALJ's decision, and find Petitioner eligible to receive benefits.

Respondent argues the ALJ gave specific and legitimate reasons for rejecting the opinions of Petitioner's treating physicians, and adequately supported her credibility determination by reference to substantial evidence in the record. Respondent contends also that Petitioner failed to challenge all of the reasons the ALJ gave for discounting Petitioner's credibility, and therefore waived his right to challenge them. Last, Respondent asserts the ALJ supported her reasons for finding Petitioner did not meet a listing, and that Petitioner did not contest the ALJ's evaluation of the four broad areas of functioning.

Each of the alleged errors will be discussed in turn, beginning with the ALJ's credibility assessment, and then turning to her evaluation of the physician opinions and

last, to the finding concerning listing level severity. The Court will proceed in this order because the adverse credibility finding appears to be the underpinning of the ALJ's other findings.

1.      **Credibility**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ's findings must be supported by specific, cogent reasons. *Reddick*, 157 F.3d at 722. If a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints of pain based solely on lack of medical evidence. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). *See also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (holding that an ALJ may not discredit a claimant's subjective testimony on the basis that there is no objective medical evidence that supports the testimony).

The ALJ must first determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). The claimant is not required to show that his impairment could reasonably be expected to cause the severity of the symptom he has alleged; he need only show that it could reasonably have caused some degree of the symptom. *Id.* Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof. *Id.*

If the claimant satisfies the first step of this analysis, and there is no evidence of

malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so. *Burch*, 400 F.3d at 680. This is not an easy requirement to meet---the clear and convincing standard is the most demanding required in Social Security cases. *Garrison*, 759 F.3d at 1014–15 (citations omitted) (internal quotation marks omitted).

In evaluating credibility, the ALJ may engage in ordinary techniques, including considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony, or between claimant's testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which claimant complains. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Also, the ALJ may consider the location, duration and frequency of symptoms; factors that precipitate and aggravate those symptoms; the amount and side effects of medications; and treatment measures taken by the claimant to alleviate those symptoms. *See* Soc. Sec. Ruling 96-7p.

### A.      *Headaches*

Petitioner argues the ALJ erred in rejecting the testimony he offered at the hearing and the evidence in the record regarding the frequency and severity of his headaches. Specifically, Petitioner contends the ALJ did not discuss the evidence demonstrating that Petitioner suffered from migraines which occurred up to three times each month or more, rendering him unable to leave the house. According to the vocational expert, an

individual limited to unskilled work missing three or more days of work in a given month would be precluded from all work. (AR 65.)

Respondent argues Petitioner failed to challenge the specific reasons provided by the ALJ for discounting his credibility in his opening brief, and that the unchallenged reasons were supported by the record as a whole. Respondent notes the ALJ cited the lack of treatment records, clinical observations, improvement with treatment, and failure to follow treatment as adequate reasons for the ALJ's adverse credibility finding. Petitioner in his reply brief argues to the contrary, contending that the ALJ failed to evaluate the medical record as a whole, and instead relied upon isolated entries in certain medical records. Petitioner contends that, if the reasons the ALJ gave for rejecting Petitioner's credibility were accepted, Petitioner would be required to seek treatment every time he suffered a headache. Further, Petitioner argues the medical records reflect he has been prescribed a number of medications to treat the severity of the symptoms he experiences.

Petitioner testified at the hearing that his headaches increased in frequency prior to January 30, 2014, and he had to stop working as a result of headaches occurring two to four days each week. (AR 49.) After Petitioner stopped working, his headaches decreased in frequency, provided he managed stress and avoided headache triggers. *Id.* However, even with active management, and while not working, Petitioner's headaches occurred up to three times each month. *Id.* Petitioner testified that, when he is not experiencing a headache, he is functional. (AR 50.) When he is experiencing a migraine, he is unable to

do anything. (AR 52.) Petitioner kept a journal documenting the frequency of his migraines. (AR 24, 432.)

The ALJ concluded Petitioner's testimony concerning the frequency of his headaches were not entirely credible based upon treatment records noting "only two significant headaches, July 23, 2014, and September 25, 2014." (AR 24.) However, the ALJ's conclusion rests upon a misreading of the administrative record, and the type of treatment Petitioner received for his headaches. A review of Petitioner's medical records reveals Petitioner sought continuing treatment for frequent, recurring headaches between 2014 and 2016, and that he consistently reported suffering headaches, at the very least, two (and up to four) times each month.

For instance, Dr. Halversen's treatment notes during the period between January 15, 2014, and July 2, 2014, indicate Petitioner's headaches were not well controlled. On March 3, 3014, Petitioner reported having had three headaches the week prior. (AR 399-400.) The ALJ apparently also overlooked the treatment note dated March 20, 2014, in which Petitioner presented to Dr. Halversen's office "having a severe migraine" and obtaining minimal relief after taking Sumatriptan "this morning." (AR 396-97.) He was taking Sumatriptan for migraine relief twice each day, and still experiencing only three to four days "headache free" for the "past few weeks." (AR 397.) On April 14, 2014, Petitioner reported experiencing three to four migraines per week. (AR 392.) This represented a decrease in his "overall weekly headache load." (AR 396.) Dr. Halversen

recorded that Petitioner was using Sumatriptan as prescribed for migraine abortion, which "truly has helped." (AR 396.)

On July 23, 2014, Petitioner reported to Dr. Tyler Mayo[5] that the Sumatriptan was no longer working, and he was experiencing migraines three to four times each week. (AR 440.) During the visit, Petitioner described his symptoms as including left sided pain, photosensitivity, sensitivity to sounds, nausea, irritability, and fatigue. (AR 440.) Dr. Mayo prescribed Propranolol as a preventative medication, and gave Petitioner an injection of Phenergan and Toradol for pain relief during the office visit. (AR 441.) Petitioner again reported to Dr. Halversen no improvement in his headaches at office visits on October 6 and 13, 2014. (AR 511, 526.) At the October 13 follow up visit, Petitioner reported that the Propranolol did not improve his headaches and did not lessen their frequency. (AR 509.) Dr. Halversen noted that Petitioner's headaches had been "refractory to other attempts at treatment," and he prescribed Cyclobenzaprine three times per day for headaches. At an office visit with Dr. Halversen on April 8, 2016, Petitioner reported continuing to experience headaches four to five times each month on average, and that the Sumatriptan was working. (AR 564.)

The ALJ failed to properly consider this relevant evidence regarding the frequency of Petitioner's headaches, and the measures taken to treat them, relative to Petitioner's ability to work full time without excessive absences. Substantial evidence in the record

---

[5] It appears that Dr. Mayo was part of the same practice group as Dr. Halversen, who was Petitioner's primary physician.

establishes Petitioner suffered from headaches requiring the administration of Sumatriptan (and other drugs) on a daily basis to abort them. The administrative record is replete with references to Petitioner's headaches occurring on a weekly basis, despite following physician's orders regarding his medication. Petitioner's headache questionnaire indicated that, after taking his medication, symptoms persisted for three to four hours and that, during such times, he dealt with the pain by lying down. (AR 245; 441.) Petitioner's headache journal generally appears consistent with the frequency of headaches he reported to his physicians. Petitioner's brother corroborated Petitioner's testimony. (AR 247-248.)

Without any discussion of these facts, the ALJ failed to build a logical bridge between the evidence and her conclusion that Petitioner's testimony about the frequency of his headaches, which could result in absences from employment at least two times each month, was not credible. Rather, it appeared the ALJ focused only upon the fact that, when not having a headache, Petitioner was functional, with no discussion regarding his ability to maintain a regular work day and work week while experiencing headaches on a random, and recurrent, basis as much as twice each week. (AR 24, 25.)

The ALJ also selectively relied upon two instances in the record where Petitioner reportedly was suffering from a severe migraine. (AR 24, 440, 480.)[6] From these two

---

[6] Petitioner sought treatment from Dr. Mayo for his migraine symptoms on July 23, 2014, because abortive medications failed to provide relief. (AR 440.) On September 25, 2014, he arrived for his consultative examination with Dr. Whitley wearing dark glasses, because he was experiencing a migraine at that time. (AR 480.)

**MEMORANDUM DECISION AND ORDER - 16**

records, the ALJ concluded Petitioner's headaches were not as frequent as he reported. However, if the ALJ's logic is credited as a legitimate basis to discount the reported frequency of Petitioner's headaches, Petitioner would be required to visit either his physician or the emergency room each time he was suffering a headache, despite having abortive medication prescribed to control them.[7] Here, the Court finds the ALJ's conclusion regarding the frequency of Petitioner's headaches is not supported by substantial evidence in the record and is instead contradicted by Petitioner's headache journal, his consistent reports over time to his physicians about the frequency of his headaches, physician's notes, and his brother's corroborating testimony.

Next, the ALJ discounted the severity of Petitioner's migraines because he "has not tolerated any control-type medications," did not follow up on a neurology consultation because he was "unable to afford the consultation," and brain imaging had not been performed because Petitioner "reported symptoms of the classic type." (AR 592.) Based upon these reasons, the ALJ concluded "treatment records are generally consistent with the claimant's testimony that most days per month he is functional." (AR 24-25.) The Court finds the ALJ's logic lacking in substance.

First, while an "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an adverse credibility finding, *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007), the ALJ is critical of Petitioner because he failed to respond to a specific

---

[7] The two instances the ALJ relied upon reflect Petitioner's abortive medication did not eliminate his headache, and he required more aggressive interventions to alleviate his headache symptoms.

treatment, without further explanation. However, as discussed above, Petitioner consistently sought treatment from his physicians. When symptoms became severe, he was prescribed Propranolol, which did not result in a decrease in frequency of headaches. He later was prescribed Cyclobenzaprine three times daily. Dr. Halversen noted that other than the Sumatriptan, Petitioner's headaches were refractory to other drug treatments. The ALJ failed to explain why Petitioner's inability to tolerate control-type medications, when his headaches had proven refractory to such treatments, undermined Petitioner's credibility.

Second, the ALJ may not rely upon Petitioner's failure to pursue a neurology consultation here. Petitioner was referred to a neurologist for a consultation. However, the record establishes, as does the ALJ's written determination, that Petitioner did not follow up because he could not afford to do so. (AR 592.) "Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995). There is no evidence in the record establishing Petitioner had the means to afford a neurology consultation. To the contrary, the record established Petitioner lived with his brother, and he earned approximately $200 each month by performing freelance copy editing work on a part time basis. (AR 50-51, 247.) The record establishes Petitioner sought treatment he could afford to manage his headaches, which included medication management with various abortive drugs.

Third, it is unclear why the lack of brain imaging undermines Petitioner's credibility. "Because there is no test for migraine headaches, 'when presented with documented allegations of symptoms which are entirely consistent with the symptomatology for evaluating [the claimed disorder], the Secretary cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence." *Federman v. Chater*, No. 95 CIV. 2892 (LLS), 1996 WL 107291, at *2 (S.D.N.Y. Mar. 11, 1996); *see also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 884 (9th Cir. 2006) (the regulations prohibit the discrediting of a claimant's subjective pain testimony based upon the lack of objective medical evidence). Further, there is evidence in the record that Petitioner's physicians had not strenuously pushed brain imaging, "because it is not indicated as his symptoms are classic…." (AR 592.)

And, there is no evidence in the record that Petitioner's physicians believed brain imaging together with a neurological work up would reveal another cause for Petitioner's headaches that could be treated with other modalities. *See, e.g., Tully v. Colvin*, 943 F. Supp. 2d 1157, 1165 (E.D. Wash. 2013) (objective tests are administered to rule out other diseases and alternative explanations for the pain but do not establish the presence or absence of diseases like fibromyalgia, as fibromyalgia cannot be objectively proven). The ALJ failed to explain how the lack of brain imaging undermined Petitioner's credibility for a condition that is not diagnosed using such a technique, and that his physicians did not believe was medically necessary. (AR 592.)

Last, the ALJ again mentioned Petitioner was functional "most days per month," yet failed to explain the effect upon full time employment of regular absences or being off task during days each month when Petitioner was not functional. The vocational expert testified that an individual limited to unskilled work who was either off task more than 20% of an eight-hour work day, or missed more than two days of work each month, would be unemployable.

The Court finds the ALJ's failure to reconcile the substantial evidence in the record with the vocational expert's testimony results in an inconsistency with regard to the ALJ's credibility analysis. In essence, the ALJ recognizes Petitioner will not be functional for some days each month, but does not discuss the vocational expert's testimony that missed work, whether due to absences or interruptions from psychologically based symptoms, will result in termination from employment for the representative occupations meeting the criteria of the ALJ's hypothetical. (AR 63-65.)

Based upon the above, the Court finds that substantial evidence does not support the ALJ's adverse credibility finding regarding the frequency and severity of Petitioner's headaches, which in turn affected Petitioner's ability to maintain regular work attendance.

**B.** *Mental Impairments*

Petitioner summarized his long history with depression in his opening brief, noting that he has suffered from depressive episodes that cause a lack of focus, concentration, and motivation. He argues the evidence demonstrates that, as a result, he would be unable

to perform full-time work on a competitive basis, and that the ALJ failed to provide clear and convincing reasons for rejecting Petitioner's testimony about the frequency and severity of his depressive episodes.

Respondent contends the ALJ's proffered reasons for rejecting Petitioner's testimony concerning the frequency and severity of Petitioner's depressive episodes is supported by substantial evidence in the record. Respondent relies upon the ALJ's observation that two records from April of 2016 indicated Petitioner did not appear depressed; that his symptoms improved with treatment; and that Petitioner did not always follow recommended treatment. The Respondent noted also that the ALJ relied upon Petitioner's admitted marijuana use against medical advice, which Petitioner used at night to combat insomnia and anxiety.

The ALJ committed reversible error by relying upon isolated instances of improvement. With regard to mental health issues, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017. Reports of "improvement" in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of his symptoms. *Id.* (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1200-01 (9th Cir. 2008) ("Nor are the references in [a doctor's]

notes that Ryan's anxiety and depression were 'improving' sufficient to undermine the repeated diagnosis of those conditions, or [another doctor's] more detailed report."). They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace. *Id.*

Here, rather than describe Petitioner's symptoms, course of treatment, and bouts of remission, and chart a course of improvement, the ALJ improperly singled out two mental status reports (one on April 8, 2016, and a second on April 12, 2016) where Dr. Downey and Dr. Syverson, respectively, observed Petitioner to be healthy and in no acute distress, with no appearance of depression. (AR 25, 566, 594.) While the ALJ can certainly cite examples to show why the ALJ does not believe a claimant is credible, "the data points they choose must in fact constitute examples of a broader development to satisfy the applicable clear and convincing standard." *Garrison v. Colvin*, 759 F.3d 995, 1018 (9th Cir. 2014). The ALJ instead chose one data point, in April of 2016, which is not consistent with the directive in *Garrison*.

Here, the record reveals Petitioner's symptoms waxed and waned during the period after his alleged disability onset date. His depression was marked by tearfulness, insomnia, and anxiety. (AR 514.) In May of 2014, Dr. Halversen noted Petitioner was experiencing suicidal thoughts, sadness, and social withdrawal. (AR 389-392.) On February 13, 2015, Petitioner sought treatment for a major depressive episode lasting two weeks, during which he contemplated suicide. (AR 529.) On July 29, 2015, Petitioner

reported three instances of worsening depression symptoms over the course of 2015. (AR

532.) Between August of 2015 and April of 2016, the record indicates Petitioner received

psychotherapy treatment from Verena Roberts, Ph.D., to address symptoms of depression

and anxiety. (AR 569-591.) Thus, while there were periods when symptoms improved,

Petitioner experienced highs and lows. These highs and lows were reflected in

Petitioner's PHQ-9[8] scores between 2014 and 2016, which ranged from a low of 12

(moderate depression) to a high of 25 (severe depression).[9]

Even within the two records from April of 2016 selected by the ALJ to highlight

"improvement," the entirety of the medical record was not mentioned. At the earlier visit

on April 8, 2016, while Dr. Downey observed Petitioner "[did] not appear depressed at

this time," objective testing indicated his GAD-7 Anxiety screening score was 13, and

that after administration of the PHQ-9, Petitioner rated the difficulty of his problems as

"very difficult." (AR 566.) His PHQ-9 depression screening score was 18. (AR 566.) Dr.

Downey assessed Petitioner's depression and anxiety as "currently uncontrolled but not

suicidal at this time…With any hopes [sic] this episode is like those in the past and [sic]

---

[8] PHQ-9 stands for Psychometric Depression Scale. (AR 388.) It is a set of nine questions used to screen for depression. (AR 388.) A score of 10-14 indicates moderate depression; a score between 15-19 indicates moderately severe depression; while a score between 20-27 indicates severe depression. (AR 425.)

[9] A longitudinal history of Petitioner' PHQ-9 scores reveal the following: February 24, 2014, score of 24 (AR 405); March 20, 2014, score of 20 (AR 399); April 14, 2014, score of 18 (AR 395); May 15, 2014, score of 21 (AR 391); June 2, 2014, score of 17 (AR 389); July 2, 2014, score of 18 (AR 384-386); February 13, 2015, score of 24 (AR 513); July 29, 2015, score of 17, noting "3 bad episodes" of depression "this year" lasting "about 3 weeks" (AR 514, 515); August 12, 2015, score of 18 (AR 538); December 2, 2015, score of 12 (AR 542).

only last a few weeks." (AR 568.) Petitioner was advised to follow up with Dr. Syverson in one week, which he did on April 12, 2016.

Dr. Syverson's office treatment notes on April 12, 2016, do state that Petitioner's general appearance was normal and that he had no suicidal ideations, (AR 594), but Petitioner's chief complaint that day was insomnia. His GAD-7 score was 14, evidence of "moderate anxiety." (AR 592.) Petitioner reported also suffering panic attacks daily. (AR 592.) He was taking Venlafaxine, Ambien, and Buspirone to manage his psychiatric symptoms. (AR 593.) The ALJ either ignored or rejected this evidence, and she instead chose an isolated phrase from these two records less than a week apart from each other to substantiate her conclusion that clinical observations did not support the alleged severity of Petitioner's depression. The Court finds the ALJ erred in concluding that these two isolated notations in April of 2016 undermined Petitioner's testimony concerning the frequency and severity of Petitioner's depression symptoms over the course of more than two years.

The Court rejects also Respondent's argument that the ALJ correctly relied upon Petitioner's failure to follow prescribed treatment as support for rejecting his credibility. The ALJ noted Petitioner stopped taking his antidepressant medications without consulting providers in 2014 and in 2015, and again in 2016. (AR 25.) However, *Garrison* cautions that it is not appropriate "to punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions."

*Garrison*, 759 F.3d at 1018 n.24. Here, the records the ALJ cited show that Petitioner's decision to stop taking a medication were in part a result of the side effects, and the exacerbation of other symptoms. For instance, Petitioner ceased taking Venlafaxine when it caused a migraine. (AR 569.) He discontinued Prozac because he struggled with "sexual side effects." (AR 588.)

Last, the Court finds Respondent's argument that the ALJ properly relied upon the Petitioner's "excessive use of marijuana," which "likely adversely affected the Claimant's mood," is misplaced. (AR 25.) Petitioner admittedly used marijuana to combat insomnia. (AR 520.)[10] Dr. Roberts on August 18, 2015, recommended Petitioner should stop using marijuana. (AR 520.) Petitioner thereafter stopped using marijuana, but continued to be treated for depression. (AR 592.)[11] The ALJ failed to supply any link between Petitioner's reported marijuana use, which he allegedly used at night for his insomnia, and his symptoms of depression.

In sum, the Court concludes the ALJ did not offer specific, clear, and convincing reasons for rejecting Petitioner's testimony concerning the frequency and severity of his physical and mental impairments. The Court finds the reasons given by the ALJ are not supported by substantial evidence in the record, and rest upon a mischaracterization of the same, as well as a misunderstanding of the two conditions Petitioner suffers, which do

---

[10] Petitioner possessed a medical marijuana identification card issued by the state of California, where such use is legal. (AR 317.)

[11] On April 12, 2016, Petitioner reported he had not used marijuana for six months. (AR 592.)

not result in daily disabling symptoms. The ALJ did not adequately address the evidence

in the record establishing Petitioner may experience disabling symptoms, whether from

migraines or depression, resulting in frequent absences each month, thereby potentially

precluding competitive, full time employment.

**2.     Whether the ALJ Improperly Weighed the Medical Opinion Evidence**

In social security cases, there are three types of medical opinions: "those from

treating physicians, examining physicians, and non-examining physicians." *Valentine v.*

*Comm'r*, 574 F.3d 685, 692 (9th Cir. 2009) (citation omitted). "The medical opinion of a

claimant's treating physician is given 'controlling weight' so long as it 'is well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo*

*v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)); *see*

*also* SSR 96-2P, 1996 WL 374188, at *1 (S.S.A. July 2, 1996) (stating that a well-

supported opinion by a treating source which is not inconsistent with other substantial

evidence in the case record "must be given controlling weight; i.e. it must be adopted.").

ALJs generally give more weight to medical opinions from treating physicians,

"since these sources are likely to be the medical professionals most able to provide a

detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a

unique perspective to the medical evidence that cannot be obtained from the objective

medical findings alone or from reports of individual examinations...." 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2). Thus, the opinion of a treating source is generally given

more weight than the opinion of a doctor who does not treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Should the ALJ decide not to give the treating physician's medical opinion controlling weight, the ALJ must weigh it according to factors such as the nature, extent, and length of the physician-patient relationship, the frequency of evaluations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician. *Trevizo*, 871 F.3d at 676; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Although a "treating physician's opinion is entitled to 'substantial weight,'" *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (citation omitted), it is "not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Rather, an ALJ may reject the uncontradicted opinion of a treating physician by stating "clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citation omitted); *see also* SSR 96-2P, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that

weight."). However, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

In determining the intensity, persistence and limiting effects of Petitioner's symptoms, Petitioner asserts the ALJ failed to provide legally sufficient reasons for rejecting the opinions of Dr. Halversen and Dr. Roberts, and did not discuss Dr. Mayo's opinion. Petitioner argues that the five separate treating source opinions from the three physicians who treated Petitioner between May of 2014 and April of 2016, were consistent with each other and were supported by Petitioner's treatment records. Pet. Brief at 18. The Court agrees, as explained below.

### A.    Dr. Halversen

Dr. Halversen began treating Petitioner in January of 2014, and saw Petitioner eleven times between January and July of 2014. (AR 413.) He completed three separate mental residual functional capacity assessments dated March 7, April 29, and July 30, 2014. (AR 495-497, 503-505.) Dr. Halversen also wrote a letter dated May 20, 2014, directed to Petitioner's employer, explaining the course of treatment and Petitioner's prognosis for returning to work. (AR 498-499.)

The ALJ proffered five reasons for discounting the opinions of Dr. Halversen: internal inconsistency; inconsistency with treatment notes; inconsistency with other objective findings in the record; inconsistency with Petitioner's daily activities; and, based upon Petitioner's self-reports rather than objective findings. (AR 26.) Respondent

argues the ALJ's reasons are specific and legitimate. However, upon review, the Court finds the reasons are not legitimate and are not supported by the record as a whole.

The Court finds the ALJ's first reason—internal inconsistency—is not supported by the evidence in the record and Dr. Halversen's treatment notes during the relevant time period. Petitioner asserts that the reason Dr. Halversen's three assessments differed slightly was because Dr. Halversen charted a decline in Petitioner's functioning over the relevant time period. This is borne out by a review of the medical records and Dr. Halversen's May 20, 2014 letter, which explained that Petitioner's symptoms "have been progressive over the past year with worsening symptoms in the past 3-4 months." (AR 498.) A review of Dr. Halversen's reports reflect the same. For instance, the March 7 report states Petitioner "is currently in a distressed state of mind," and had impaired reasoning and suicidal ideations. (AR 494.) Dr. Halversen reported that Petitioner would have trouble interacting with people. (AR 495.) At that time, Dr. Halversen was of the opinion that Petitioner may be able to work with accommodations, such as desk work or working from home. (AR 495.)

Dr. Halversen's April 29, 2014 report reflects a decline in functioning, despite the absence of suicidal ideation. (AR 496.) For instance, Dr. Halversen reports that Petitioner at that time was "unable to function at a reasonable rate/pace to meet demands of current job description." (AR 496.) Petitioner's concentration was impaired, and he exhibited a distressed, flat affect and was suffering panic attacks. (AR 496.) Dr. Halversen was of the opinion that Petitioner could not work at that time, but projected an anticipated return to

work date of June 1, 2014. Dr. Halversen noted that Petitioner's medications had recently been adjusted.

Dr. Halversen's July 2014 evaluation utilized a check-the-box format, wherein he documented several markedly limited areas of functioning, notably in the ability to maintain attention and concentration; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and the ability to respond appropriately to changes in the work setting. Dr. Halversen provided a narrative explanation of his answers, explaining that Petitioner "suffers greatly" from the debilitating effects of migraines and depression. (AR 505.) Thus, while the three opinions did in fact differ, the evidence in the record reflects the differences were a result of a decline in functioning between January of 2014 and July of 2014. The ALJ made no effort to reconcile this evidence, despite the fact that reasons were given in the reports themselves for the differences between them. (AR 26.)

The ALJ's next three reasons are not explained. Instead, the ALJ perfunctorily concluded, without explanation, that Dr. Halversen's opinions were inconsistent with "the majority of Dr. Halversen's treatment notes and objective findings" and "other objective findings." The ALJ provided no citation to any of these objective findings. (AR 26.) However, a review of the record indicates certain objective findings, namely Petitioner's PHQ-9 scores, repeatedly showed Petitioner suffering from psychiatric symptoms. *See* note 5, supra (noting PHQ-9 scores over time). There are no objective findings regarding Petitioner's migraines, other than the few instances when Petitioner's

symptoms were severe enough that he sought more aggressive treatment; Petitioner's migraines, as explained above, were such that there would not be any objective findings. The Court therefore finds the ALJ's reasons are not specific or legitimate reasons supported by substantial evidence in the record.

As for Dr. Halversen's treatment notes, a review of the same over the period between January 15, 2014 and July 2, 2014, reflects continual treatment for symptoms of depression and migraines, and the treatment notes appear consistent with the three opinions Dr. Halversen rendered over the same period. On February 5, 2014, Petitioner reported feeling worse after having taken Zoloft. (AR 407.) Dr. Halversen described Petitioner as "extremely labile, has severe anhedonia." (AR 407.) Petitioner's PHQ-9 score that date was 25. (AR 409.) Because of his reaction to Zoloft, Dr. Halversen changed Petitioner's medication to Lexapro. (AR 410.)

On February 24, 2014, Petitioner reported struggling to control his depression, and that he was having frequent migraines. (AR 403.) On March 20, 2014, Petitioner reported having a severe migraine, insomnia, and that his depression was stable. (AR 396-97.) On April 14, 2014, Petitioner reported 3-4 migraines per week, insomnia, and depression. (AR 392.) On May 15, 2014, Petitioner reported worsening symptoms of depression. (AR 389.) His corresponding PHQ-9 score that date was 21. (AR 391.) Dr. Halversen concluded that a medication change might be beneficial, in that a "TCA" may control both Petitioner's depression and migraines. (AR 392.) On June 2, 2014, Petitioner reported that his headaches were less frequent, and his mood was mildly improved. (AR

386.) Dr. Halversen increased the dosage of Amitriptyline. (AR 389.) By July 2, 2014, Petitioner's depression was more stable, but he scored an 18 on his PHQ-9. (AR 384.) Headache symptoms were worse, however.

The ALJ failed to reconcile Dr. Halversen's treatment notes, which showed waxing and waning depression symptoms that never dropped below the moderately severe level, and frequent headaches once or twice weekly, with Dr. Halversen's opinions regarding the effects of depression and headaches upon Petitioner's ability to competitively perform work on a full-time basis.

The ALJ also failed to explain which evidence supported her conclusion that Dr. Halversen's opinions conflict with Petitioner's activities of daily living. The ALJ provided no explanation. (AR 26.) And, as discussed above, the ALJ failed to reconcile the fact that Petitioner's migraines and depression symptoms may cause excessive absenteeism. Rather, the ALJ focused instead on the fact that Petitioner was functional "on most of the days per month." (AR 24.)

The Court finds the ALJ erred by rejecting the opinions of Dr. Halversen, because she failed to offer bases for her conclusions that were supported by substantial evidence in the record.

## B. Dr. Mayo

Petitioner astutely points out that the ALJ did not discuss Dr. Mayo's opinion at all in her written determination. Rather, the ALJ appears to have attributed Dr. Mayo's opinion to Dr. Halversen, and in so doing, the ALJ determined a conflict existed between

Dr. Halversen's July 30, 2014, and Dr. Mayo's October 6, 2014, opinion statements. (AR 26.) The ALJ failed to recognize that Dr. Mayo authored the October 6, 2014 opinion, not Dr. Halversen. Dr. Mayo examined Petitioner on July 23, 2014, October 6, 2014, and again on February 13, 2015. (AR 500, 511, 512.) The first two visits addressed Petitioner's migraine symptoms, while the last visit addressed Petitioner's complaint of a major depressive episode. Dr. Mayo authored two reports – one dated July 23, 2014, (AR 430), and a second corresponding to his treatment note dated October 6, 2014, (AR 506 – 508).[12] Dr. Mayo's July 23, 2014 report provides an opinion on the debilitating effects of Petitioner's migraines. (AR 430.) Dr. Mayo was of the opinion that Petitioner's migraines limited Petitioner's ability to work full time because, while suffering a migraine, Petitioner had "serious limitations," and would be "unable to work with migraine symptoms." (AR 430.)

On October 6, 2014, (AR 524), Petitioner's chief complaint was migraines. Petitioner reported that his headaches had not improved, and that he could not work a regular schedule. (AR 524.) The corresponding mental residual functional capacity assessment Dr. Mayo provided that same date indicated Petitioner would be markedly limited in the areas of sustained concentration and persistence, including the ability to

---

[12] Respondent argues the ALJ's error should be excused, because Dr. Mayo's signature on the October 6, 2014 report is illegible. It is. However, it is clear from the record that the report, dated October 6, 2014, was likely authored by Dr. Mayo because he examined Petitioner on October 6, 2014. Further, Dr. Mayo printed his name above his signature on the July 23, 2014 report, and the signature from the July 23, 2014 report appears to match that of the signature on the October 6, 2014 report. Respondent did not address in his briefing the ALJ's failure to discuss Dr. Mayo's July 23 report.

complete a normal workday and workweek; markedly limited in the ability to maintain appropriate social interaction with the general public or coworkers; and, markedly limited in his ability to travel in unfamiliar places or use public transportation. Dr. Mayo explained that Petitioner "currently has the ability to function without deficit however, when having a migraine headache, he has significant disability as described above." (AR 508.)

The ALJ simply pointed out the inconsistencies between Dr. Mayo's October 6, 2014 report and Dr. Halversen's July 30, 2014 report, with no explanation, and utilized the mere fact of the inconsistencies as a reason to discredit Dr. Halversen's opinion. However, upon closer review, Dr. Mayo explained that his opinions were directed at the debilitating effects of Petitioner's migraines when symptomatic. (AR 508.) Dr. Halversen's July 30, 2014 report, on the other hand, explained that he was addressing Petitioner's migraines and their interplay with Petitioner's depressive episodes. (AR 505.) He was not addressing the level of functioning Petitioner would have while symptomatic with a migraine, as was Dr. Mayo. In other words, without addressing the reason for the inconsistencies, the ALJ erred by concluding the inconsistencies themselves constituted enough evidence, alone, to discredit the opinions expressed in the two reports.

Petitioner argues also that it was error for the ALJ to overlook Dr. Mayo's two opinions. The Court agrees. The ALJ cannot completely ignore or disregard the opinions of a treating physician and the corresponding treatment notes. *See Means v. Colvin*, No. 2:15-CV-0327-KJM-CKD, 2016 WL 366358, at *4 (E.D. Cal. Jan. 29, 2016), report and

recommendation adopted, No. 2:15-CV-0327-KJM-CKD, 2016 WL 4047006 (E.D. Cal.

Mar. 7, 2016) (remanding for further administrative proceedings where ALJ failed to

discuss treating physician's opinion). Nor has Respondent sufficiently addressed how the

error is harmless, considering Dr. Mayo explained that his answers on the mental residual

functional capacity assessment form addressed Petitioner's level of functioning assuming

Petitioner was experiencing migraine symptoms. Respondent (and the ALJ) failed to

address the specifics of Dr. Mayo's treatment notes, and instead Respondent broadly

argues that the opinion is inconsistent with treatment notes in general. Resp. Brief at 7.

However, Respondent did not explain how Dr. Mayo's opinions were inconsistent with

his treatment notes. Even had Respondent done so, the Court is not permitted to make ad

hoc rationalizations for the ALJ's failure to consider relevant evidence in the record.

*Lewin v. Schweiker*, 654 F.2d 631, 634-35 (9th Cir. 1981).

Here, the Court cannot conclude that the ALJ's error was "inconsequential to the

ultimate nondisability determination," *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir.

2012), and therefore cannot find that the ALJ's error was harmless. The ALJ failed to

address the opinions of Dr. Mayo in any manner whatsoever, leaving the Court unable to

accurately assess whether the ALJ properly weighed the opinion medical opinion

evidence in the record when determining Petitioner's RFC, and, ultimately, whether the

ALJ's RFC discrimination was supported by substantial evidence.

### C. Verna Roberts, Ph.D.

Dr. Roberts completed three check-the-box forms, all dated April 12, 2016. (AR 551-558.) She accompanied the forms with a narrative letter, also dated April 12, 2016, explaining her conclusions. (AR 523.) Dr. Roberts was of the opinion Petitioner suffered from major depressive and somatic symptom disorder which is "linked to an exacerbated pain experience and triggers significant migraines." (AR 553.) She estimated Petitioner would be absent from work more than five days each month, and that Petitioner would be unable to perform a job eight hours per day, five days per week on a sustained basis. She was of the opinion that Petitioner's prognosis was "poor," and that Petitioner would not be able to "consistently hold employment." (AR 523.)

Petitioner argues the ALJ erred by failing to give more weight to Dr. Roberts' opinion, which the ALJ assigned minimal weight for five reasons. (AR 27.) The ALJ presented a list of the reasons in her opinion. (AR 27.) Notably, however, the ALJ failed to provide an explanation; did not offer a substantive basis for her conclusion; and did not point to evidence in the record supporting the reasons given for giving little weight to Dr. Roberts' opinion. (AR 27.) The Court finds the ALJ failed to satisfy the substantial evidence requirement, because she did not set out a detailed and thorough summary of the facts and conflicting clinical evidence, she did not state her interpretation thereof, and she did not make specific findings. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citing *Reddick*, 157 F.3d at 725). "The ALJ must do more than state conclusions. [She] must set forth [her] own interpretations and explain why they, rather than the

doctors', are correct." *Id*.

Respondent argues the record adequately supports the ALJ's proffered reasons. Respondent's Brief at 8-9. The Court finds, however, that the record contradicts the ALJ's proffered reasons, and Respondent failed to support his arguments regarding the same. Rather, Respondent simply offered boilerplate reasons and citation to legal authority, with no explanation to bolster the ALJ's proffered reasons, as explained below.

The ALJ's first reason for discounting Dr. Roberts' opinion was that she saw the claimant on a "limited, on-and-off basis, for seven months." (AR 27.) However, the ALJ should consider the type and frequency of the contact between the medical source and the claimant. 20 C.F.R. § 404.1527(c)(2)(i). The record reflects Petitioner was referred to Dr. Roberts by Dr. Halversen, had his first appointment on July 31, 2015, and saw Dr. Roberts a total of eight times over the course of seven months. (AR 551.) It is not clear to the Court how eight visits over the course of seven months equates to a "limited, on-and-off basis."[13] The ALJ failed to provide any explanation regarding the support for her conclusion, nor is her conclusion supported by the record.

The ALJ's second reason was that Dr. Roberts reported "some exaggeration in the claimant's self-reporting." (AR 27.) Respondent cites to Dr. Roberts' April 12, 2016 letter, which indicates Petitioner suffered from "somatic symptom disorder."

---

[13] The record reflects Petitioner saw Dr. Roberts more frequently during some months than others, and that there was a gap in treatment between November of 2015 and April of 2016. (AR 569-591.) The ALJ offered no explanation for her conclusion that unevenly spaced visits constituted a reason to discount a treating physician's opinion.

Respondent's Brief at 8. Dr. Roberts administered the PAI, a self-report inventory measuring well-defined clinical and personality constructs, on August 18, 2015. (AR 583.) From that, she concluded Petitioner's answers exhibited "some exaggeration in regards to negative impression management. The patient may have portrayed himself in a more negative manner as he endorsed items that are less likely endorse[d] by the general clinical population." (AR 583.) Based upon Petitioner's scores, Dr. Roberts concluded that individuals with "similar profiles are likely to view their lives severely interrupted by physical problems with a significant depressive experience." (AR 583.)

A review of Dr. Roberts' notes does not indicate Dr. Roberts discounted Petitioner's symptoms based upon the PAI results. Rather, Dr. Roberts diagnosed Petitioner with Somatic Symptom Disorder, (AR 551), and she explained that the disorder was marked by "worry about his health and his migraines," which "significantly affect[s] him and his functioning." (AR 523.) Somatization Disorder is a recognized disorder. 260640 somatization disorder, STEDMANS MEDICAL DICTIONARY 260640. It is not clear to the Court how the ALJ can support her conclusion that Petitioner exaggerated his symptoms, when the disorder is recognized as a mental disorder characterized by a process in which "psychological needs are expressed in physical symptoms; e.g., the expression or conversion into physical symptoms of anxiety…." 828490 somatization, STEDMANS MEDICAL DICTIONARY 828490.

The ALJ's third reason given for discounting Dr. Roberts' opinion was that her treatment notes did not support the significant limitations included in the opinions.

Respondent cited to one treatment note in November of 2015, where Dr. Roberts reported Petitioner was doing much better despite depressive episodes. Respondent's Brief at 8. Dr. Roberts' treatment notes, however, reflect that Petitioner initially presented on August 6, 2015, "with a recurrent pattern of chronic depression accompanied by intense anxiety and suicidal ideation." (AR 588-591.) Petitioner had a follow up appointment on August 11, 2015. (AR 585.) At that visit, Dr. Roberts concluded Petitioner required outpatient, individual therapy to "prevent decompensation and worsening of symptoms…Treatment is expected for 6 months." (AR 856.) By October 1, 2015, Petitioner reported improvement in his thinking errors. (AR 575.) On November 23, 2015, Petitioner reported suffering a depressive episode and having made progress toward his goals. (AR 572.) However, despite reporting progress, Dr. Roberts' assessment indicated that Petitioner continued to have depressive episodes, and she recommended additional counseling. (AR 574.)

On April 11, 2016, Petitioner suffered a "full blown anxiety attack in [Dr. Roberts'] office and we used calming techniques to calm him down." (AR 569.) Petitioner reported symptoms of insomnia, suicidal ideation, and anxiety. (AR 569.) Dr. Roberts described Petitioner as presenting with "chronic depression accompanied by intense anxiety and suicidal ideation." (AR 571.) As discussed above, the ALJ cannot rely upon one instance in time without a discussion of the longitudinal treatment record to conclude Petitioner's mental health symptoms resolved. *Garrison*, 759 F.3d at 1017. Rather, the record reflects Petitioner's symptoms waxed and waned over the course of

Dr. Roberts' treatment history.

The ALJ's fourth reason was that the check-the-box forms were inconsistent with one another, specifically that the "second form is inconsistent with the first form and the third form is inconsistent with the second." (AR 27.) Dr. Roberts completed the forms on the same date. A close review of the forms reveals that the first and third forms, and the answers to the check-the-box questions, are identical to one another. (AR 551-553, 556-558.) The second form, titled "medical opinion to do work-related activities (mental)," is a more detailed check-the-box form. (AR 555-556.) The form does not ask the same questions in the same manner as the first and third forms. Thus, there is a legitimate reason that both the first and third forms are inconsistent with the second form, and the ALJ's proffered reason is not supported by substantial evidence.

And last, the ALJ rejected Dr. Roberts' opinion because she did not provide an indication of "how she measured the claimant's activities of daily living, social functioning, concentration, persistence, [] pace, or episodes of decompensation." (AR 27.) A review of the forms, however, indicates that Dr. Roberts relied upon her own clinical interview with Petitioner, as well as Petitioner's history and medical file; progress and office notes; and psychological evaluations and reports in forming her opinions. (AR 554.)

The Court finds the ALJ failed to offer specific, legitimate reasons supported by substantial evidence for giving the opinions of Dr. Roberts "minimal weight." This is especially true considering the opinions of Drs. Roberts, Halversen, and Mayo were

consistent with regard to Petitioner's projected absences from work due to the intrusion of either migraines or depressive symptoms. In other words, the consistency of Petitioner's treating physicians' reports in that regard merits some consideration, which the ALJ failed to discuss. *See Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007) ("consistency of [] treating physicians' reports merits additional weight. Consistency does not require similarity in findings over time despite a claimant's evolving medical status.").

## 3.    Step Three: Meet or Equal a Listing

Petitioner argues the ALJ failed to adequately consider the treating physicians' opinions in evaluating whether Petitioner's impairments, either singly or in combination, met or medically equaled a listed impairment. At step three, if the claimant satisfies the criteria under a listing and meets the twelve-month duration requirement, the Commissioner must find the claimant disabled without considering age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(iii), (d). A claimant bears the burden of producing medical evidence that establishes all the requisite medical findings that her impairments meet or equal any particular listing. *Bowen v. Yuckert,* 482 U.S 137, 146, n. 5 (1987). Further, if the claimant is alleging equivalency to a listing, the claimant must proffer a theory, plausible or otherwise, as to how her combined impairments equal a listing. *See Lewis v. Apfel,* 236 F.3d 503, 514 (9th Cir. 2001).

Because the Court finds the ALJ erroneously failed to consider Dr. Mayo's opinion and erred in weighing Dr. Halversen's and Dr. Roberts' opinions, it declines to

address the alleged error committed at step three at this time. Proper consideration of the treating physicians' opinions and the evidence of record will afford the ALJ an opportunity to reassess her determination whether Petitioner's impairments, either singly or in combination, meet or medically equal the severity of a particular listing.

**4.      Remand for Calculation of Benefits**

Petitioner argues that the ALJ's decision should be reversed, and that the Court should find the Petitioner eligible to receive maximum monthly disability insurance benefits. Petitioner's brief at 21. Respondent did not address whether it would be improper for the Court to remand for an award of benefits.

Under the credit-as-true rule, a court may remand for an award of benefits when all of the following conditions are met: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand. *See Garrison*, 759 F.3d at 1020.

In the exercise of its discretion, the Court will remand for further proceedings. Neither Petitioner nor Respondent adequately raised the credit as true issue, and therefore it is appropriate for the Court to remand for further proceedings consistent with the Court's opinion rather than award benefits.

## CONCLUSION

Based upon the above, the Court finds the ALJ's reasons for disregarding Petitioner's testimony were legally insufficient, and the ALJ did not properly weigh the physician opinions. The Court declines to address the purported errors Petitioner alleges at step three. Even so, upon remand the ALJ must consider the treating physicians' opinions with regard to the analysis at step three.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiff's Petition for Review (Dkt. 1) is **GRANTED**.

2) This action shall be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

3) This Remand shall be considered a "sentence four remand," consistent with 42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).

DATED: September 19, 2019

Honorable Candy W. Dale
United States Magistrate Judge